CITY OF JERSEY CITY, A MUNICIPAL CORPORATION OF NEW JERSEY, ET AL., RELATORS-APPELLANTS, v. HOMER ZINK, COMPTROLLER OF THE TREASURY OF NEW JERSEY, ET AL., RESPONDENTS-RESPONDENTS.

Argued June 7, 1945—Decided November 29, 1945.

For the relators-appellants City of Jersey City, Alfred Pakenham, Marie A. Pakenham and William A. Nolan, *Charles A. Rooney.*

For the relators-appellants Township of Weehawken and Harry C. Moore, *John N. Platoff.*

For the relators-appellants the Town of West New York, Peter Dugan and Frances Dugan, *Samuel I. Hirschberg.*

For the relator-appellant the mayor and council of the City of Hoboken, *John J. Fallon* (*Otmar J. Pellett,* of counsel).

For the relator-appellant Town of Secaucus, *Edward A. Smarak.*

For the relators-appellants, *Charles Hershenstein* (*Milton B. Conford,* of counsel).

For the respondent-comptroller, Homer C. Zink, *Walter D. Van Riper,* Attorney-General (*Herbert J. Hannoch* and *Benjamin C. Van Tine,* of counsel).

For the respondent Board of Education of the City of Newark, *Jacob Fox.*

The opinion of the court was delivered by

CAMPBELL, CHANCELLOR. This is an appeal from a judgment of the Supreme Court entered upon an order discharging certain consolidated rules directing the State Comptroller to show cause why a writ of *mandamus* should not issue commanding him "to draw his warrant upon the Treasurer of the State of New Jersey for the distribution of interest which became due on taxes assessed against Class 2 railroad property and has been paid into the State Treasury, to the municipalities in which said Class 2 property was situated \* \* \*."

The Supreme Court held (132 *N. J. L.* 601) :

"The questions at issue are broadly two:

"I. Will the writ go against a state officer? This depends upon the question of whether *R. S.* 54:24–11, *et seq.,* still controls the distribution of moneys derived from railroad tax payments.

"II. Are chapters 4, 5, 6 and 34 of *Pamph. L.* 1945, constitutional enactments?"

The members of the court found themselves "not completely in accord" upon the second question above stated and dismissed the consolidated rules to show cause, stating "The constitutionality of the statute is the main issue before us."

Consequently this appeal to this court under *R. S.* 2:83–15.

Following the decision of this court in *Wilentz, Attorney-General, &c.,* v. *Hendrickson, State Treasurer, &c.,* 135 *N. J. Eq.* 244, the delinquent railroads paid into the state treasury, as required by statute, $20,203,639.33 on account of principal of past due taxes and $15,276,373.33 in interest due and owing under *R. S.* 54:27–4, the correct amount of this latter item being in dispute between the railroads and the state at that time and is in litigation now. Certain other railroads are still in default as to principal or interest or both. The tax arrearages were for the years 1932 to 1940, inclusive.

The principal and interest on the past due Class I, III and IV railroad taxes were paid into the state treasury pursuant

to *R. S.* 54:24–6 and the paid principal of Class II railroad taxes was allocated and distributed by the State Treasurer and State Comptroller to the municipalities entitled thereto under *R. S.* 54:24–11 and 54:24–13. The State Comptroller refused to allocate and distribute to these same municipalities $8,076,047.60 which is the interest actually paid by the railroads on Class II taxes, and he challenged their right to it under *R. S.* 54:24–11 and 54:24–13 on the ground that these sections did not specifically authorize the distribution of it on the same basis as the principal of Class II taxes.

This impasse between the relators-appellants and the respondent-comptroller was reached late in 1944. Early in 1945, and subsequent to our judgment in *Wilentz* v. *Hendrickson, supra,* the legislature passed *Pamph. L.* 1945, *chs.* 4, 5, 6 and 34, the ostensible general purpose of which was a new and integrated statutory scheme for the allocation and distribution of the interest already paid and to be paid on such past due railroad taxes. The real and drastic change designed to be accomplished by the statutes is the diversion of all the interest, paid or unpaid and accrued on unpaid principal, of all Class II railroad taxes from the municipalities in which such properties are located and for whose purposes such taxes were assessed, levied, collected and dedicated by statute, *R. S.* 54:24–7 to 54:24–13 and to require that they be paid into the treasury of the state as general funds subject to use by the state or kept available for such other purposes as the legislature should determine.

The respondents, at the outset, raise two objections to the proceedings: (1) they are in fact a suit against the state which may not be maintained without its consent; (2) *mandamus* will not issue in a doubtful case.

A consideration of all the applicable statutes, together with decisions of this court construing them, discloses that the duties imposed by these sections of the statute upon the State Comptroller are ministerial and do not involve any exercise of discretion by him as a state officer.

A suit against a state officer or agency to compel by *mandamus,* or similar process, the performance of official duties of a purely ministerial nature, involving the exercise of no

discretion is not a suit against the state and may be maintained without its consent, 59 *C. J.* 312, § 466; 38 *Id.* 659, § 198. It is the essence of a prerogative writ, such as *mandamus,* that it is an appeal to the crown or sovereign state to remedy whatever may be amiss in the conduct of its public affairs, because the administration thereof is not chargeable to the crown personally or the state, but is chargeable to the ministers or officers who are accountable to the people. The prerogative of the crown or state extends not to do any injury; for being created for the benefit of the people, it cannot be exerted to their prejudice. 3 *Blackstone* *255.

The reason for the rule that *mandamus* will lie against a state officer is that a sovereign state must be presumed to be willing that its laws shall be obeyed. Through its laws it speaks to its servants and commands them to do that which is required. Certainly those servants by their acts of disobedience do not represent or stand for the state. The action on *mandamus,* therefore, instead of being a suit against the state, is against its servants to compel them to do that duty, which by accepting office, they agreed to perform, 59 *C. J.* 312. Where the duty of a public treasury official is delineated and "charged by statute," the writ will clearly lie. *Tapping on Mandamus* *265.

This we conceive to be the situation here presented. *Cf. Angle* v. *Runyon, Comptroller,* 38 *N. J. L.* 403; *Compton* v. *Anderson, Comptroller,* 52 *Id.* 150; *Willson* v. *Swain, Treasurer,* 60 *Id.* 115; *Trustees of Rutgers College* v. *Morgan, Comptroller,* 70 *Id.* 460; *affirmed,* 71 *Id.* 663. In the very case relied on most strongly by the respondent-comptroller to support his arguments as to the proper construction of *R. S.* 54:24–11 and 54:24–13, *Burlington County* v. *Martin, &c., Murray, Comptroller, et al.,* 128 *N. J. L.* 203; *affirmed,* 129 *Id.* 92, this court did not question that *mandamus* would lie against the State Comptroller. The Comptroller is an auditing officer and cannot question the validity of an act of legislation directing the payment of money by the state or disregard its authority, *Angle* v. *Runyon, Comptroller, supra* (at *pp.* 408, 409).

We hold, therefore, adversely to the contentions of the

respondent-comptroller on both of these preliminary objections.

With these questions disposed of we turn our attention to the other basic issues suggested, but not decided, by the Supreme Court.

The first is: Is the interest on delinquent taxes against Class II railroad properties a part of the tax and does it follow the principal?

We conclude that it is and does. This is conclusively disposed of by *Wilentz* v. *Hendrickson*, 135 *N. J. Eq.* 244, 256. The holdings of this court in *Burlington* v. *Martin*, 129 *N. J. L.* 92; affirming 128 *Id.* 203, and *Wilentz* v. *Hendrickson*, 135 *N. J. Eq.* 244, are not in conflict. Neither the class of tax nor the statutes are identical.

The interest follows the principal in a transfer inheritance tax and is wholly retained by the state. The amendment whereby the county of decedent's residence profits to the extent of five per cent. of the tax (54:33–10) does not include any part of the interest. The statute does not so provide. These statutes are not *in pari materia* and no legitimate argument could be advanced for that proposition. The former is a transfer inheritance tax statute; the latter a Railroad Tax Act providing for taxation of a certain class of railroad property.

That the interest follows the principal is a corollary of *Wilentz* v. *Hendrickson, supra*. The interest was compensation for the loss of the use of the principal and on this basis alone it follows the principal. There is nothing in the statutes to suggest a purpose to separate the two and make one disposition of the principal and another of the interest, but quite to the contrary. Since interest is compensation for loss of the use of the principal it inevitably follows that the interest belongs to him who has lost the use of his principal. A contrary construction would do violence to reason and logic.

The history of all these statutes clearly indicates a legislative intent to compensate municipalities for the loss of ratables used for railroad purposes. Originally the property a railroad could acquire and hold was limited by its charter. See Charter of New Jersey Railroad and Transportation Com-

pany, limiting it to a main stem width of 66 feet and for each terminal three acres. *Pamph. L.* 1832, *pp.* 96, 98, 102. In the face of agitation starting in 1846, *Pamph. L.* 1855, *ch.* 52, *p.* 118, was enacted and authorized the railroads to acquire lands in excess of their charter grants but provided that the excess should be subject to taxes the same as other lands in the same city would be. As the railroads acquired such other properties there was great public agitation that they, too, should pay a fair share of the cost of local government which reached high points in 1846, 1869, 1870 and 1881.

The preamble of *Pamph. L.* 1873, *ch.* 450, *p.* 112, clearly states the legislative intent that the burden of local government should be shared by the railroads. The act of 1884, followed this pattern and intention. The 1896 Commission appointed by the Governor recommended that Class II railroad property should be taxed and the proceeds allotted to the local taxing districts. See Commission Report, pages 13–25. This said also that in all large cities throughout the country where railroad terminals are located, similar property is taxed and the tax turned over to local governments as compensation for the loss of ratables. The history and purpose of subsequent legislation, now found in the Revised Statutes of 1937, is set forth at length in *Board of Assessors* v. *Central Railroad Co.,* 48 *N. J. L.* 146; *Bergen and Dundee Railroad Co.* v. *State Board of Assessors,* 74 *Id.* 742, 744; *Central Railroad Co.* v. *State Board of Assessors,* 75 *Id.* 120, 124; *Id.* 771, 773.

There is disclosed in all this history a legislative intent to compensate the local district for the loss of ratables. It follows, therefore, that the interest should follow the principal as compensation for the non-payment of the principal of the tax.

If such taxes, when due, are not promptly paid, the loss falls upon the particular municipality—not the state. Therefore the compensation for the loss (interest), when paid, goes to remedy the situation resulting from delinquence. This is the common sense of the matter.

In *Burlington County* v. *Martin, supra,* the affirmance of this court was based primarily upon the ground that the

settled practical construction of the statute for over thirty
years coupled with a delay of four years in asserting its rights
did not justify the county's claim to interest, and that the
prerogative writ of *mandamus* would not be awarded where
such allowance would create disorder and confusion.

This we particularly pointed out in the *Wilentz* v. *Hendrick-
son* case which is controlling here.

In *Wilentz* v. *Hendrickson, supra* (at *p.* 256), this court
speaking through Mr. Justice Perskie said: "The statute
(*R. S.* 54:27–4, *et seq.*) fixes the quality of the interest
charge; and we are not at liberty to make an essential dis-
tinction not found in the legislative expression. The interest,
as it accrues, merges in what the statute itself denominates a
'debt' due [from the company] the state * * * for which
an action at law or suit in equity may be maintained, and
shall be a preferred debt in case of insolvency."

The depositions taken in the cause indicate that it has been
a long standing practice to allocate and distribute the interest
on the same basis as the principal of the tax. In the absence
of a specific provision in the statute there could be no other
rational construction thereof. Contemporaneous construction
has given the force of law to the doctrine that the interest
follows the principal. The duty was apparently so obvious
that prior State Comptrollers followed the practice without
question. The respondent-comptroller admits the practice
and the effect of contemporaneous construction, but his posi-
tion is that such action and practice were erroneous.

We hold to the contrary and that under the statute the
interest is an integral and inseparable part of the tax debt
and is to be distributed on the same basis as the tax principal
for these reasons: (1) such a conclusion is compelling in
the decision in *Wilentz* v. *Hendrickson, supra,* (2) in the
absence of a specific provision to the contrary, no other
rational construction of the statute is possible, (3) the unin-
terrupted contemporaneous construction placed upon these
actions for years by the respondent-comptroller's predecessors
in office is most persuasive in reaching this conclusion.

Most of the provisions of "An act for the taxation of rail-
road and canal property" (*Pamph. L.* 1884, *ch.* 101, *p.* 142)

as amended and supplemented were repealed by *Pamph. L. 1941, ch.* 291, as amended by *Pamph. L.* 1942, *ch.* 169, but the seventy-fourth section of these acts (*R. S.* 54:29A–74), provides that "Nor shall this act affect in any manner any distribution allotment or apportionment of tax receipts made or required to be made under any provision of law repealed by this Act." In such a situation the rule is that the pre-existing law stands unaffected.

We now turn to a consideration of chapters 4, 5, 6 and 34, *Pamph. L.* 1945.

Their intended effect is to divert and redistribute these interest funds. While the enactments are four in number they present one integrated plan and purpose and must be considered *in pari materia.*

The relator-appellants contend that these statutes for several reasons are unconstitutional.

We are warranted in determining these questions to consider the purpose and effect of these acts and are not limited to "verbal and rhetorical niceties." *Wilentz* v. *Hendrickson, supra* (at *pp.* 251, 252), and cases there cited; *Erion* v. *Board of Pension, &c., Hoboken,* 11 *N. J. Mis. R.* 122, 126; *affirmed,* 111 *N. J. L.* 243.

Generally speaking, all taxes are state taxes and may be distributed by the legislature without control of the judicial department. However, such legislative power of distribution is subject to the restraints of the constitution having regard in the construction thereof to certain established fundamental rules and principles under our republican form of government.

We so held in *Jersey City* v. *Martin,* 126 *N. J. L.* 353, and this is conceded by the relators as well as that they have not vested interest in the funds. However, when these funds (interest) were paid, being an inseparable part of the tax debt, they were constructively funds of the respective taxing districts in which were located second class railroad properties upon which the principal of these taxes had been assessed and raised. To all intents and purposes the situation became the same as if the money (interest) had been distributed, as it should, with the principal under *R. S.* 54:24–11 and 13.

Constructive possession is a possession in law, without pos-

session in fact; that which exists in contemplation of law, without actual personal possession. *Hodges* v. *Eddy,* 38 *Vt.* 344; 3 *Bouv. Law Dict., "Possession;"* 7 *Am. & Eng. Encycl.* 4; 8 *Cyc.* 1142; 12 *C. J.* 1304.

The lowest and most imperfect degree of title consists in the mere naked possession, or actual occupation of the estate without any apparent right or any shadow or pretense of right, to hold and continue such possession. The right of possession may reside in one man while the actual possession is not in himself but another. Though the actual possession be lost, yet he still may have the *right of possession* and may assert it whenever he thinks it proper. 2 *Blackstone* *196.

And this is the situation here.

Our holdings in *Wilentz* v. *Hendrickson, supra,* both in reason and logic lead to the indubitable conclusion that these funds (tax principal and interest) were in the constructive possession of the respective municipalities as an inseparable part of the tax debt from the time of the payment thereof by the tax debtor.

It is to be borne in mind that as to Class I, III and IV properties that part of the tax was levied for "the uses of the State, according to law," at a state rate fixed by the legislature, and the valuations were not included in the local ratables.

On the other hand, Class II property valuations were added to the aggregate of valuations of the districts where such properties were located, *R. S.* 54:24–9, the anticipated income from the tax was included in the receipts of the local budgets, *Williams* v. *Bettle,* 51 *N. J. L.* 512, and the tax levied at a local rate struck on this bases, *R. S.* 54:24–10. The tax when collected was allotted to the local district to be "at the disposal of the proper authorities for public purposes." *R. S.* 54:24–13.

This plan met the constitutional requirements set out in the decisions of this court in *Bernards Township* v. *Allen,* 61 *N. J. L.* 228, and *Van Cleve* v. *Passaic Valley Sewerage Commission,* 71 *Id.* 574.

We held in those cases that where there is a delegation of the taxing power, or an essential element thereof, to a local

taxing district, the tax raised thereunder can only be used for the *sole purpose* of enabling such districts to exercise the powers of government conferred on them within the territorial limits of the district.

The fixing of a rate is an essential part of the taxing power. A local tax rate in a taxing district of this state is determined annually and increases or decreases in approximately direct proportion to the cost of local government. The principle that taxation and representation go together which applies here, *Van Cleve* v. *Passaic Valley Sewerage Commission, supra* (at *p.* 584), has its genesis in the right of a citizen to choose by ballot the officers of a taxing district for whose public purposes he is taxed and a citizen can thereby control the expenditures and cost of government in that district. *Van Riper* v. *Parsons,* 40 *N. J. L.* 1 (at *p.* 5).

It follows, therefore, that the local taxing district was entitled under our system of representative government to these funds.

The temporary actual possession of the state was but a convenient form of collection and distribution of the tax. *State Board of Assessors* v. *Central Railroad Co., supra* (at *p.* 292). The local districts were entitled to receive the tax *in toto* just as other municipal taxes are received for local purposes generally, *Gillen* v. *Essex County Board of Taxation,* 91 *N. J. L.* 76 (at *p.* 80).

The fact that the moneys in question may be extra moneys not called for by the current local budgets is of no moment. A sufficient answer to that is that the burdens of taxation in the future are lightened to that extent. *Pennsylvania T. & T. R. R. Co.* v. *Hendrickson,* 87 *N. J. L.* 239, 243; *Cf. Williams* v. *Bettle, supra.*

The moneys were to be distributed to the local districts for local purposes and in the absence of a specific provision we discern no legislative intention that they could be diverted to other unrelated purposes prior to their disbursement.

There is no doubt but that the legislature may do as it will with tax funds, collected or uncollected, distributed or undistributed, in whole or in part, so long as it is accomplished in a way and manner, which under the facts pre-

sented, do not violate the constitutional restraints and limitations and fundamental principles of taxation.

But do these enactments do so?

Our answer is in the negative.

Whether denominated as tax, recapture, or diversion acts the result is the same.

And it must be prominently kept in mind that what the legislature may not constitutionally do directly it may not do indirectly. *In re Voorhees,* 123 *N. J. Eq.* 142; *Union County Trust Co.* v. *Martin,* 121 *N. J. L.* 594; 124 *Id.* 35, and *Wilentz* v. *Hendrickson,* 135 *N. J. Eq.* 244 (at *p.* 252).

The acts in question plainly violate article IV, section 7, paragraph 11, of the constitution in that they are special and discriminatory and arbitrarily create a classification of fourteen contributing municipalities and 553 beneficiary municipalities.

Under this provision of the constitution, the state may not arbitrarily take funds from one municipality and allot them to another, nor arbitrarily require a group of municipalities to contribute from their tax revenues to the support of the state government and absolve others from the same obligation, especially where the diverted funds are derived from assessments levied upon local properties. Nor may the state call upon the municipalities, or some of them, to turn over to it, for state purposes, or for disbursement to other municipalities, moneys raised by local taxation upon a specified class of property, such as farm lands, public utilities or any other special class, for thereby would be created a grossly disproportionate sharing of the common obligation and some would escape it entirely.

The distribution of the burden cannot be arbitrary or unreasonable.

The purpose, operation and effect of these statutes will be a diversion that will bring a loss to municipalities in Hudson County of $3,612,907.45 to the benefit and gain, in varying amounts to these in each of the other twenty counties of the state.

In other words an impost is laid upon the Hudson County municipalities for the benefit and gain of the municipalities

and school districts of all the rest of the state. Does·this make for equality and uniformity of the tax burden or is it confiscation? The presentation of the proposition immediately forces the latter as the answer.

As stated by Chief Justice Beasley in *Agens* v. *Newark* (*Court of Errors and Appeals*, 1874), 37 *N. J. L.* 415, 421: "In a government in which the legislative power is not omnipotent, and in which it is a fundamental axiom that private property cannot be taken without just compensation, the existence of an unlimited right in the lawmaking power to concentrate the burthen of a tax upon specified property, does not exist. * * * If this cannot be maintained, then it follows that it is conceded that the legislative power in question is not completely arbitrary. It has its limit; and the only inquiry is, where that limit is to be placed."

It is axiomatic that a draft by the state upon the municipalities for the support of the state government, or a subject of primary concern to it, must apportion the burden equally and fairly among the municipalities for, in the final analysis, the local owners of real and personal ratables are affected, since the moneys thus withdrawn are necessarily, both in theory and practice, reflected in their tax bills.

The sole criterion, in these statutes, of the obligation to contribute moneys for general state or state school purposes is the legal right to receive tax moneys from a *particular* kind of assessed ratable and all municipalities which are not in this category are exempt from the obligation of making contributions.

This makes these acts clearly special and discriminatory and the classification is illusory and inappropriate.

They create preferences and inequalities within a class and do not operate equally on all members of the class. *Alexander* v. *Elizabeth*, 56 *N. J. L.* 71, 81, 82; *Van Riper* v. *Parsons*, 40 *Id.* 1; *Woodruff* v. *Passaic*, 42 *Id.* 533. They do not *incidentally* produce a local or special result but were illusorily conceived with a purpose and idea that their inherent force and scope would produce a local and not a general result. *In re Cleveland*, 51 *Id.* 319, 322; *Raymond* v. *Teaneck*, 118 *Id.* 109; *In re Prudential Insurance Co.* (*Court of Chancery*),

132 *N. J. Eq.* 170, 173. And their resulting effect is to regulate the "internal affairs of towns and counties * * *."

All matters which are the subject of control by a municipality, which exist or may thereafter be conferred, concern the internal affairs of a town, county or municipality. *Alexander* v. *Elizabeth, supra* (at *p.* 76). A law regulates the internal affairs of a municipality when it imposes an expense upon it or adds to its treasury, *State* v. *Price,* 71 *N. J. L.* 249, 251, or regulates how it shall spend its funds, *Freeholders* v. *Stevenson,* 46 *Id.* 173, 187. See, also, *Anderson* v. *Trenton,* 42 *Id.* 486, 488; *Freeholders of Hudson* v. *Buck,* 51 *Id.* 155, 159; *Halsey* v. *Nowrey,* 71 *Id.* 481, 485, and cases cited there.

In fact these statutes work arbitrary impositions upon certain municipalities and their taxpayers for the benefit of other municipalities and the state generally. Impositions are not laid upon 394 municipalities and not visited upon 553, in the sense that the combined effect is such as to give to the latter a net pecuniary gain.

In *Skinkle* v. *Essex Road Board* (*Supreme Court,* 1885), 47 *N. J. L.* 93, recognition is given to the principle that the legislature may not divert the property of one municipality to the support or benefit of another.

This is precisely what was done here. The interest moneys, following the principal, were the property of the respective municipalities, although constructively, but there is no essential difference, in principle, between moneys in the local treasuries and funds belonging to the municipalities but· in the state treasury, for the time being, merely awaiting proper distribution.

And in *Baldwin* v. *Fuller* (1877), 39 *N. J. L.* 576, 578; *affirmed* (1878), 40 *Id.* 615, Mr. Justice Van Syckle said: "But it seems equally clear that a tax for state purposes must fall upon the state at large; for county purposes, upon the county; and for the public uses of any lesser political district, upon such district.

"The County of Hudson could not be required to defray the entire expense of the state government, nor could one township, in that county, be compelled to yield the whole

revenue necessary for county purposes; nor could the legislature impose upon a single citizen the whole burden of taxation in the township in which he may reside. *Any such fiscal scheme would be pronounced, by the common judgment of mankind, so contrary to the principles of natural justice, that we would be driven to conclude that there was some radical error in the premises upon which its justification was grounded.* Not that courts may pronounce a law which it is within the general sphere of legislation to pass, to be void merely because it is, in their judgment, contrary to the principles of equity. The rule is conceded to be otherwise, *but there are some things so repugnant to our sense of justice, that we cannot admit that they are comprehended, in our system, in the powers of government.* As an instance, we unhesitatingly declare that the legislature cannot make a man to be a judge in *his* own case. Aside from this consideration, laws of the character specified would, to the extent that one man's property *is appropriated by them, in excess of his just contribution, to relieve others of a public burden, properly resting upon them, take private property for public use, without just compensation. It would be confiscation, not taxation."* [Italics ours.]

For these reasons we find that chapters 4, 5, 6 and 34, *Pamph. L.* 1945, are constitutionally infirm and so arbitrary and unjust and discriminating that they cannot be upheld. They violate the essential quality of fairness in the matter of just distribution of the burdens of government. The funds in question should have been and must be distributed as provided by *R. S.* 54:24–11 and 13.

Other constitutional infirmities are urged, but having concluded as we do that these enactments are special and discriminatory and thus trespass upon article IV, section 7, paragraph 11 of the state constitution it becomes unnecessary to consider or pass upon the other objections thereto.

The judgment under review is reversed and the cause remanded to the Supreme Court with direction to issue its peremptory writ of *mandamus* in accordance with the prayer of the petition.

McGeehan, J. (Dissenting.) The City of Jersey City et al. appeal from a rule of the Supreme Court discharging rules to show cause why *mandamus* directed to the State Comptroller should not issue, commanding him to draw his warrants upon the State Treasurer for the distribution of interest which became due on taxes assessed against Class II railroad property and has been paid into the state treasury, to the municipalities in which said Class II property was situated.

In 1944, certain railroads which had defaulted in the payment of taxes during the years 1932 to 1940, paid into the state treasury the amounts of such defaulted taxes and also the amounts of interest, as computed by them to be due; $20,203,639.03 so paid was designated by them as taxes, and $15,276,373.93 so paid was designated as interest on said defaulted taxes. Most of such interest on such defaulted railroad taxes was paid pursuant to *R. S.* 54:27–4, which provides: "If the taxes of any company, or any portion thereof, remain unpaid on December first following the levying thereof, the company shall be considered in default, and such taxes, or the unpaid portion thereof, shall thenceforth bear interest at the rate of one per cent. for each month until paid," and the balance of such interest was paid pursuant to section 4 of *Pamph. L.* 1941, *ch.* 290, which provides: "* * * interest at the rate of three percentum (3%) per annum shall be paid annually upon the balance of delinquent taxes remaining unpaid from and after December first, one thousand nine hundred and forty." Of the total amount paid on account of Class I, II, III and IV railroad property, $10,476,050.70 represented taxes assessed against Class II railroad property, and of the interest paid, $8,076,047.60 represented interest which accrued on such defaulted Class II railroad taxes.

Jersey City, on July 19th, 1944, made a demand on the Comptroller as follows: "The City of Jersey City takes the position that it is entitled, under *R. S.* 54:24–11 (repealed, but still effective as to distribution of taxes for the years 1932-40), both to taxes and interest accrued upon taxes derived from the assessment of Class II property situated in the City of Jersey City."

On August 22d, 1944, the Comptroller paid to the various taxing districts (including Jersey City) which were entitled thereto, the entire $10,476,050.70 representing the principal taxes assessed against Class II railroad property, but made no payment of any interest moneys received by the state on said taxes. The action of the Comptroller was predicated upon his conclusion that *Pamph. L.* 1944, *ch.* 150 and *R. S.* 54:24-11 (the applicable statutes) made an appropriation of the principal taxes assessed against Class II railroad property, but made no appropriation of any interest which had accrued on said taxes.

On January 29th, 1945, the legislature enacted and on January 30th the Governor approved chapters 4, 5 and 6 of 1945 which became effective immediately and which by their terms made specific appropriations of the moneys already received by the state as interest on past due railroad taxes. By chapter 4, approximately $3,300,000 was appropriated to the municipalities who received distribution of the delinquent Class II railroad tax principal. By chapter 5, approximately $5,800,000 was appropriated to the school districts of the state. By chapter 6, approximately $4,000,000 was appropriated to all municipalities, to be distributed on the basis of average daily attendance in the public schools. These three acts appropriated approximately $13,100,000 of interest in the state treasury out of a total of $15,276,373.93 received in the summer of 1944.

On January 30th, 1945, on application of Jersey City, and shortly thereafter on application of others, the rules to show cause involved in this case were entered in the Supreme Court, in which proceedings one of the claims advanced was that chapters 4, 5 and 6 of 1945 are unconstitutional.

On March 12th, 1945, the legislature enacted and on March 13th the Governor approved chapter 34 which reads as follows:

"An act concerning the disposition of certain moneys received and to be received by the State as interest on past due railroad taxes.

"BE IT ENACTED by the Senate and General Assembly of the State of New Jersey:

"1. All moneys received by the State as interest on past due railroad taxes and held by the State Treasurer on January thirtieth, one thousand nine hundred and forty-five, shall be retained in the State Treasury as part of the general State funds, subject to appropriation hereafter by the Legislature; *provided, however,* that moneys may be withdrawn therefrom without further appropriation, pursuant to the provisions of 'An act for the relief of certain municipalities,' approved January thirtieth, one thousand nine hundred and forty-five (P. L. 1945, c. 4), 'An act for the relief of school districts,' approved January thirtieth, one thousand nine hundred and forty-five (P. L. 1945, c. 5), and 'An act making an appropriation to the municipalities of this State to be used for the purposes of tax reduction,' approved January thirtieth, one thousand nine hundred and forty-five (P. L. 1945, c. 6).

"2. All moneys received and which shall be received by the State after January thirtieth, one thousand nine hundred and forty-five, as interest on past due railroad taxes shall be retained in the State Treasury as part of the general State funds, subject to appropriation hereafter by the Legislature.

"3. This act shall take effect immediately."

On March 13th, 1945, the rules to show cause were extended so that relators might question the constitutionality of *Pamph. L.* 1945, *ch.* 34.

On May 1st, 1945, a rule discharging the said rules to show cause was entered in the Supreme Court.

There are four fundamental considerations in the light of which these appeals must be considered. They are:

1. The interest moneys in question are in the state treasury.

2. The state has a vested interest in those moneys.

3. No money shall be drawn from the treasury but for appropriations made by law.

4. The court can have no concern with the policy, justice or wisdom of the legislation, if the legislation is within constitutional limitations.

These appeals present three questions for determination.

### First Question.

Do the present proceedings constitute a suit against the state which may not be maintained because the state has not consented thereto?

The majority answers that they are not and I concur; but for the following reason which is not set forth in the majority opinion. The appellants recognize the principle that suit may not be brought against the state without the state's consent and limited their application to the Supreme Court to the claim that the statute ordered the performance by a state officer of a ministerial duty which involved no element of discretion or judgment. Their application was based upon the premise that they could establish that the ministerial duty to be performed was set forth in language so clear, specific and unmistakable as to admit of no reasonable doubt. *High on Ext. Legal Remedies* 12, § 9; *Cooper* v. *State Board,* 114 *N. J. L.* 10; *affirmed,* 115 *Id.* 115. Any litigant has the right to apply for *mandamus* on such a basis but unless the litigant establishes that the ministerial duty is clear, specific and unmistakable, the writ will not issue. If the application to the court were on any other basis, it would be a suit against the state.

### Second Question.

Do *R. S.* 54:24–11 and 54:24–13 require the Comptroller to pay to municipalities the moneys paid into the state treasury as interest on delinquent taxes assessed against Class II railroad property?

Appellants claim, among other things, that the general rule is that interest follows the tax in distribution and the majority opinion states the question to be "Is the interest on delinquent taxes against Class II railroad properties a part of the tax and does it follow the principal?" If the question before us were as stated by the majority, this would be a suit against the state and this court would have no jurisdiction because the state has not consented thereto. The fact is that the ques-

tion as stated by the majority was not presented or argued and is not properly before the court. The question presented was as stated above. See appellant's brief, point II, page 32, respondent's brief point, 2, page 22.

All payments of state moneys during the period in question were controlled by *Pamph. L.* 1944, *ch.* 150 (the 1944-1945 Appropriation Act), which provides in section 4, "No money shall be drawn from the treasury except for objects as hereinabove specifically appropriated \* \* \* and except such sums which are by law devoted to specific purposes, namely, \* \* \* taxes for the use of taxing districts in this state \* \* \*." Appellants rely on the provisions of *R. S.* 54:24-11 and 54:24-13 to support their claim that these interest moneys have been appropriated to them.

*R. S.* 54:24-11 provides "The entire amount of tax derived from the assessment of property described in subdivision II of section 54:22-1 of this title shall be allotted to and paid over to the local taxing districts through which the railroads or canals run, giving to each district the total amount of tax that may be so derived from such property of each railroad or canal company therein."

*R. S.* 54:24-13 provides "The comptroller shall transmit to each county treasurer a certificate showing the amounts allotted to the taxing districts therein, and shall, on or before December tenth of the year in which the taxes are payable, draw and transmit his warrant upon the state treasury, in favor of the several county treasurers, for the amounts allotted to their several counties. Each county treasurer shall forthwith and not later than December fifteenth, pay to the collector or other proper officer of each taxing district, the amount allotted thereto, deducting, however, the amount due for county taxes from the taxing district. The amount thus paid to the county and taxing district shall be at the disposal of the proper authorities for public purposes."

The answer to this second question depends upon the meaning of "the entire amount of tax derived from the assessment" of Class II property and of "Total amount of the tax that may be so derived from such property." That this language by express words, covers the principal of the tax, but does not

by express words cover the interest, is not questioned, but appellants argue that the court could *construe* this language "as having the intent of directing the distribution of all of the tax receipts, including interest on arrears, derived from the assessment of Class II railroad property" and state that three "independent considerations conduce to this view." These three considerations are: (1) "the decision in *Wilentz* v. *Hendrickson,* 135 *N. J. Eq.* 244, is controlling;" (2) "the uniform contemporaneous practical construction of *R. S.* 54:24–11 and 54:24–13 is a conclusive criterion of the legislative intent" and (3) "the general rule is that interest follows tax in distribution."

It must be borne in mind that when the language of the legislature is not express and its intent is sought in any case involving the parting with any public right, whether money or property, the room for interpretation of language, not clear and unmistakable in itself, is greatly narrowed. "No public right can be taken away by mere inference or legal construction. It can only be by express grant." *Water Commissioners of Jersey City* v. *Hudson,* 13 *N. J. Eq.* 420; see, also, *New Jersey Interstate B and T Commission* v. *Jersey City,* 93 *Id.* 550. "The law wisely forbids any one to claim that the state has given up any portion of its property or prerogatives, without showing a grant plainly worded to that effect." *State* v. *Kelsey,* 44 *N. J. L.* 1. As was said by Dixon, J., in *Little* v. *Bowers,* 46 *Id.* 300; *affirmed,* 48 *Id.* 320: "If to doubt whether the state has parted with any public right is to be resolved that it has not, certainly language can scarcely express the reluctance of courts to infer that this most important of all public rights has been surrendered."

"The intention of the legislature is to be obtained primarily from the language used in the statute." 59 *C. J.* 952. "The general rule is, that where a word or phrase occurs more than once in a statute, it should have the same meaning throughout, unless there is a clear indication to the contrary." *Waldron* v. *Rowe,* 91 *N. J. L.* 71. "Total Taxes" is used in only two other sections of the statute *R. S.* 54:24–3 and 54:24–4 and "total tax" in *R. S.* 54:27–1, and in the context the meaning of this language in each case is clear and could not include

any interest on taxes. *R. S.* 54:27-6 speaks of "such state tax and the interest due thereon" and provides that an interested person so paying shall "be entitled to be repaid the amount of the tax and interest thereon" and in four other places speaks of "the tax and interest" indicating that when the intention of the legislature was to include interest on the taxes it was specifically so stated.

The question as to whether an appropriation of "tax" includes an appropriation of interest accrued on said tax was squarely before the court in *Burlington County* v. *Martin,* 128 *N. J. L.* 203. The statute in that case made an appropriation to the counties of "five per centum of the amount of transfer tax collected" and there the County of Burlington brought the same type of proceeding as now before us on the claim that in appropriating five per cent. of the "tax" the legislature intended to include an appropriation of the interest which had accrued on said tax. The Supreme Court decided that an appropriation of "tax" did not include an appropriation of the interest thereon and Brogan, C. J., speaking for the court said:

"It is conceded that the legislature did not, by express words, provide that counties should share in the interest assessed on inheritance taxes. Since we may not attribute to the legislature an intention that the statute does not contain, or by necessary inference support, we must ascertain whether the relators' theory, *i. e.,* that interest follows and becomes part of the tax, is tenable. We do not think it is. In our view, taxes and interest are distinct things. A tax, not being a debt in the legal sense, does not automatically bear interest, if delinquent, unless the legislature so provides. Interest does not inhere in a tax as a legal incident. *Camden* v. *Allen,* 26 *N. J. L.* 398. Interest is an exaction for past due obligations and in essence is a penalty or in the nature of a penalty. Interest or penalty, however one characterizes it, is not taxation but rather a punitive sanction for compelling timely payment of the tax. It is compensation for delay in payment. (*Dixon, &c.,* v. *Jersey City,* 37 *N. J. L.* 39.) In this case it is for non-payment within the time fixed by statute (compare *Bugbee* v. *Tatum,* 103 *Id.* 600). We are of the opinion

that the interest on this tax was not, nor did it become, part of the tax. The statute, *supra*, permits the county of decedent's residence to participate in the amount of the tax, nothing more. It follows therefore that the relators' claim to a share of the interest is invalid."

In affirming this Supreme Court judgment, 129 *N. J. L.* 92, this court, while adding further grounds, approved the exposition of the law as set out in the opinion below.

In *Wilentz* v. *Hendrickson* the question was whether a forgiveness of interest on past due railroad taxes constituted an appropriation of money in violation of article I, section 20 of our state constitution. The court held that the "debt due from the company to the state" mentioned in *R. S.* 54:27–4 consisted of the unpaid principal taxes and the delinquent interest thereon and the state had a vested right in and to that interest. The distinction recognized in the Wilentz case between tax "debt" and "taxes" is apparent in the following quotation from the opinion: "We are satisfied therefore, that in the circumstances exhibited and the law applicable thereto, that the interest was compensatory and not penal, and that the state had a vested right in and to that interest, and that this interest, together with the principal taxes, constituted the tax debt due from each of the private railroad companies to the state." The question under consideration here was neither considered nor decided in *Wilentz* v. *Hendrickson*, and nothing in the opinion in that case says or implies that an appropriation of the "tax" carries with it an appropriation of the interest thereon. I conclude that *Wilentz* v. *Hendrickson* gives no support to appellants' contention.

Appellants claim that "uniform contemporaneous practical construction of *R. S.* 54:24–11 and 54:24–13 is a conclusive criterion of legislative intent;" and the majority in reaching the conclusion that "the interest is an integral and inseparable part of the *tax debt* and is to be distributed on the same basis as the tax principal" gives as one of three reasons "the uninterrupted contemporaneous construction placed upon these actions (sections) for years by the respondent-comptroller's predecessors in office is most persuasive in reaching this conclusion." Aside from the question whether contemporaneous

construction by a state official, no matter how long continued, can extend the express language of an appropriation act, the conceded facts show that there was no "contemporaneous construction" that the appropriation included interest. "Contemporaneous construction" has a definite meaning; that is that it must commence at or about the time the statute went into operation. When did these acts become operative? The language in question had its source in *Pamph. L.* 1897, *ch.* 69, which provided "The taxes which shall be hereafter assessed upon" Class II railroad property "shall be allotted to and paid over to the various taxing districts * * * giving to each such district *the total* amount of tax that may be so derived * * *" and this act was passed to appropriate to municipalities, in which Class II property was situated, the entire amount of taxes assessed against such property in place of the share theretofore appropriated; namely, an amount which could not exceed two-thirds of such tax (see *Pamph. L.* 1888, *ch.* 208; *Pamph. L.* 1884, *ch.* 101; *Pamph. L.* 1873, *ch.* 400). In 1905, when the rate was changed, the same appropriation to such municipalities was continued by using "the entire amount of tax derived from the assessment of" Class II property and "the total amount of tax that may be so derived." The identical language was carried into the Revised Statutes in 1937 by *R. S.* 54:24–11. The record shows that from 1921 to 1940 (with the exception of three years) interest received by the state on delinquent Class II property in amounts ranging from $.07 in 1928 to $97,046.77 in 1922, was paid annually to the municipalities. No suggestion is made that such construction was placed upon the statute from 1897 to 1921 or that any such interest was paid during those years. This span of almost a quarter of a century destroys any vestige of merit in the asserted argument based on contemporaneous construction.

Appellants claim that the general rule is that interest follows tax in distribution. They cite twenty-three cases, all from western states, to support this claim. Examination of these cases discloses that in *Crookston* v. *Polk County* (*Minn.*), 82 *N. W. Rep.* 586, a statute requiring the county treasurer to pay to the city "such taxes, together with all

interest and penalties which shall be collected on account of the same" was attacked as unconstitutional; *Fergus Falls* v. *Otter Tail County (Minn.)*, 93 N. W. Rep. 126, construed a statute providing "such taxes, when received, together with all interest and penalties which may be collected on account of same" shall be paid by the county to the city levying the tax; the other cases dealt with attempts by a county official (who was merely a statutory collecting agency for taxes levied by the state, a municipality or a school district and in which the county had no interest either as to principal or interest) to retain for the county moneys received by him as interest on delinquent state, municipal or school district taxes. The rule enunciated in these cases has no application to one who is not a mere collecting agency but has a vested interest in both tax and interest thereon and no case cited even suggests that it has.

I find that an appropriation of the interest moneys in question, in the words of Gummere, C. J., in *Mausoleum Builders* v. *State Board,* 90 *N. J. L.* 163, "does not appear 'by language so clear and unmistakable as to leave no doubt' of the existence of that purpose; and to doubt is to deny."

### Third Question.

Are chapters 4, 5, 6 and 34 of 1945 unconstitutional enactments?

The whole attack made by appellants upon chapters 4, 5, 6 and 34 is predicated on the premise that the interest moneys in question were appropriated to the municipalities by *R. S.* 54:24–11 and 54:24–13. Since my conclusion is that no clear and unmistakable appropriation of such interest moneys appears, the premise of appellant falls, and with it falls all attack upon the constitutionality of chapters 4, 5, 6 and 34 of 1945.

Statements are made by the majority in support of its answer to this third question which should not go unchallenged. I cite as an example "It is axiomatic that a draft by the state upon the municipalities for the support of the state government, or a subject of primary concern to it, must

apportion the burden equally and fairly among the municipalities for, in the final analysis the local owners of real and personal ratables are affected, since the moneys thus withdrawn are necessarily, both in theory and practice, reflected in their tax bills." No authority is given for this statement and I do not agree that it states the law of New Jersey. If it were the law, it would invalidate the tax on Class I railroad property which for more than seventy years has been levied by and for the use of the state (this Class I property consists. of the land in each municipality not exceeding 100 feet in width over which the main stem of any railroad runs); it would invalidate the state school tax which has been levied for more than forty years (under which ten per cent. of the amount raised in the different municipalities is held by the state and distributed to the poorer school districts of the state); it would also invalidate the state gas tax and all other taxes of the same nature.

The importance of the constitutional question of the relative rights of the judiciary and the legislature involved in this case, far transcends the admitted importance of the case itself to the municipalities and the state. Even though the equities may be all on one side in a given case, these equities may not be put in the scale to increase the measure of judicial power. It is the duty of the judiciary to see that no one department of government encroaches on the prerogatives of another. 16 *C. J. S.* 430. By the same token, the judicial branch of the government cannot encroach on or interfere with the legislative branch in the proper exercise of its constitutional powers either by enacting, amending or nullifying laws or by judicial construction. 16 *C. J. S.* 446. It is to the legislature and not to the court that our constitution has granted the power to make appropriations and except for constitutional inhibitions on that power, the legislature is answerable to the people alone for any unjust or unwise exercise of its power. In matters of appropriation particularly, the courts never should read into any appropriation act an inclusion not clearly required. It must be remembered that an error committed in extending an appropriation act by judicial construction cannot be remedied, while an error on

the part of the court in restricting the effect of an appropriation act is always open to correction by the legislature. In my opinion, the majority conclusion results in a clear usurpation by the judiciary of a purely legislative function.

Mr. Justices Colie and Oliphant and Judges Wells and Freund wish to be recorded as concurring herein.

OLIPHANT, J. (Dissenting.) I am in full accord with the opinion of Judge McGeehan. In addition thereto I am of the opinion that chapters 4, 5, 6 and 34, *Pamph. L.* 1945, are constitutional enactments. The majority opinion holds them in violation of article IV, section 7, paragraph 11 of the state constitution. The argument made is based on the false assumption that municipal funds are arbitrarily taken away from certain municipalities and given to others or to the state. The funds dealt with were state funds. *Wilentz* v. *Hendrickson*, 135 *N. J. Eq.* 244.

Because the laws under attack create different methods of allotment than that obtaining under prior acts, because some municipalities will receive less revenue, others more than they did previously, does not make them special legislation. Relators argue that because some municipalities will receive less that they are making a contribution and that their money is being diverted. As said, it never was their money, actually or constructively. They are contributing municipalities only because they will receive less under the general legislative plan of distribution or because the money will be retained in the state fund. This may be an unfortunate result from their standpoint but it is nevertheless constitutionally good legislation. Until distributed it was money of the state and it could allot it under existing acts or change the method of allotment by other appropriate legislation. According to relator's theory and that adopted in the majority opinion, appropriations once made cannot be changed unless the beneficiaries under the prior legislation receive an equivalent or greater sum under the new act. Stated another way, this amounts to an assertion that certain municipalities have received from the legislature an appropriation or grant of these funds in perpetuity.

These statutes create no "burden" or "contributing" municipalities. It is only by comparison with rights claimed to exist under prior legislation that these so-called contributions and burdens are made to appear. Comparisons with prior legislation form no basis for the determination of the question as to whether an act is general or special. Even though the acts do create variant financial burdens upon the municipalities that would not make the legislation special. *McDonald* v. *Freeholders,* 99 *N. J. L.* 393.

The only method by which the majority could hold chapter 34 unconstitutional was to say that all of these acts present one integrated plan and purpose and must be considered *in pari materia.* Chapters 4, 5 and 6 are disbursing statutes, while chapter 34 is a retaining statute, its sole purpose being to place the interest on past due railroad taxes in the general fund where it already was. Recognizing that difference the holding falls. The facts and the purposes of the acts in question refute the statement.

It is claimed by relators that if chapters 4, 5 and 6 are unconstitutional, chapter 34 is likewise so by reason of the proviso contained therein. With respect to the excision of unconstitutional features from a statute the test is "does it clearly appear that the unconstitutional feature of the statute constitute an essential motive to its enactment." *McCran* v. *Ocean Grove,* 96 *N. J. L.* 158. The legislature was on notice that chapter 4, 5 and 6 were under attack on the ground of unconstitutionality. To meet the possibility of their being held invalid or that they might "fail of effect" it enacted chapter 34 in order to keep all of the money in the general fund under any circumstances.

Appellants rely on *Rutgers Chapter, &c.,* v. *New Brunswick,* 129 *N. J. L.* 238, and say that the invalidation of the proviso of a statute will cause substantive provisions qualified by the proviso to fall also. In that case it was held that the question is one of construction and legislative intent. Of course it is plain to see that if the legislative intent is frustrated by the failure of the proviso the whole act would be invalid, and that if without the proviso the remainder of the act would be accorded a different meaning from that intended

by the legislature, the whole act would fall. This is not the situation here where the proviso is distinct and separable from the underlying enactment, *i. e.,* to put all the moneys in the general fund, and does not violate the aforementioned rule.

In *Connelly* v. *Union Sewer Pipe Co., 184 U. S.* 540, cited in the Rutgers case it was said if the enforcement of a statute with the constitutionally vicious provision eliminated "would cause results not contemplated or desired by the legislature, then the entire statute must be held inoperative." The exact opposite situation is presented in chapter 34. This court in *Attorney-General* v. *Anglesea, 58 N. J. L.* 372, said: "Where part of a statute is unconstitutional, the remaining part may stand only when it will operate in accordance with the apparent legislative intent." There is every right to believe, and all the facts show that in the instant case the legislature would have passed this statute, as it would stand after the excision of the proviso, if by chance that should necessarily be done.

I conclude, therefore, that in the first place these acts do not violate any constitutional provision and that if, perchance, any or all of chapters 4, 5 and 6 do, then chapter 34 must stand with the proviso excised.

Mr. Justice Colie, Judge Wells and Judge Freund desire to be recorded as concurring in the views above expressed.

*For affirmance*—COLIE, OLIPHANT, WELLS, FREUND, McGEEHAN, JJ. 5.

*For reversal*—THE CHANCELLOR, CHIEF JUSTICE, PARKER, DONGES, HEHER, PERSKIE, RAFFERTY, DILL, JJ. 8.