THE MEADOWLANDS REGIONAL REDEVELOPMENT AGENCY, *ET AL.* (AND CONSOLIDATED CASES), PLAINTIFFS-APPELLANTS, v. THE STATE OF NEW JERSEY, DEFENDANT-RESPONDENT.

IN THE MATTER OF THE APPLICATIONS OF THE MEADOWLANDS REDEVELOPMENT AGENCY, *ET AL.*, LOUIS MONTENEGRO AND PHILIP MELILLO, JR., *ET AL.*, AND TOWN OF SECAUCUS, *ET AL.*

Argued February 23, 1972.—Reargued February 5, 1973—Decided May 7, 1973.

Mr. *Lewis M. Holland* argued the cause for appellants Town of Secaucus, *et al.*

Mr. *Ralph W. Chandless* argued the cause for appellants Township of South Hackensack, Louis Montenegro, Philip Melillo and Board of Education of the Township of South Hackensack (*Messrs. Chandless, Weller & Kramer,* attorneys).

Mr. *Alfred A. Porro, Jr.* argued the cause for appellants the Meadowlands Regional Development Agency, *et als.* (*Messrs. Porro, Conaghan & Murray,* attorneys).

Mr. *Stephen Skillman,* Assistant Attorney General, argued the cause for respondent State of New Jersey (*Mr. Joseph M. Clayton, Jr.,* Deputy Attorney General, on the brief; *Mr. George F. Kugler, Jr.,* Attorney General of New Jersey, attorney).

PER CURIAM. This appeal involves the Hackensack Meadowlands Reclamation and Development Act and ancillary legislation *L.* 1968, *c.* 404, the constitutionality of which was upheld by the trial court in an opinion reported at 112 *N. J. Super.* 89 (Chan. Div. 1970).

The Act, *N. J. S. A.* 13:17–1 *et seq.,* represents a legislative plan for the reclamation and development of the Hackensack meadowlands on a regional basis by a Commission constituting a political subdivision of the State, with intermunicipal sharing of the respective tax benefits and tax burdens resulting from the planned development. The ancillary legislation, *N. J. S. A.* 13:1B–13.1 *et seq.* establishes a procedure for the resolution of title problems in meadowland properties throughout the State.

The trial court's opinion, *supra,* 112 *N. J. Super.* at 95–100, contains an outline of the procedural background of the case as well as a summary of the law's provisions which we find to be adequate and need not be repeated.

Although the legislation was attacked from numerous legal angles, the basic challenges to it were: (1) The Act was a special or local law not enacted in the manner prescribed by the New Jersey Constitution; (2) the Act provided an unconstitutional delegation of the legislative zoning power to the Commission; (3) the tax-sharing provisions (a) improperly delegated taxing power to the Commission, (b) imposed taxes on the constituent municipalities for the benefit of the entire State or of regions outside constituent municipalities, and provided an allotment of real property tax proceeds raised in some municipalities to other municipalities, and (c) were arbitrary in their application to the constituent municipalities.

Considerable evidence was presented to the trial court relating to the reasonableness of the classification of the Hackensack meadowlands as a separate district, as well as the boundaries fixed for such district.

The trial court in a comprehensive opinion found the Act to be a general law and the legislation to be constitutional and otherwise lawful, rejecting all of the contentions of invalidity raised by plaintiffs. We certified the appeal prior to hearing in the Appellate Division.

Argument was had before this Court on February 23, 1972. At the argument the Court expressed concern over the

fairness of the tax-sharing provisions as applied to constituent municipalities. Accordingly, the State was asked to submit available figures showing the projected operation of the tax-sharing provisions. Following receipt of such figures the Court requested a conference with counsel and their tax-sharing experts. At the conference it was indicated that the State might seek to have the tax-sharing provisions amended to remedy possible deficiencies therein. Upon being notified that the State proposed to have these provisions amended, this Court withheld decision.

Amendments were drafted and signed into law on July 19, 1972 (*L.* 1972, *c.* 103). All parties were given leave to exchange supplemental briefs addressed to the amended tax-sharing provisions and the matter was reargued on February 5, 1973. Because of the changed composition of the Court, the parties were afforded the opportunity to argue the entire appeal *de novo*.

■ We are in full agreement with the basic findings and conclusions of the trial court as to the issues raised and its upholding of the constitutionality and validity of the legislation. We find it necessary to specifically discuss only the contention that the amended tax-sharing provisions are arbitrary in their application to the constituent municipalities. We recognize that appellants also contend that the tax-sharing provisions of the Act, both as originally enacted and in their amended form, work an unconstitutional delegation of the taxing power as well as an unconstitutional allotment of local property tax revenues. However, these issues were decided by the trial court and its conclusions thereon, with which we agree (our acceptance of these conclusions should not be taken as a full adoption of the trial court's opinion dealing with these issues), are equally applicable to the amended provisions. [1]

---

[1] It is also contended that the issue whether the Act is a special or local law is before this Court for original decision by virtue of the proceedings filed in the Appellate Division under *N. J. S. A.*

The principle underlying the tax-sharing provisions of the Act is that the regional development of the district under the Master Plan[2] will result in tax benefits to some areas within the district, as well as impose tax burdens or losses on other areas. The provisions, as amended, are intended to have constituent municipalities share equitably in these benefits and burdens.

The mechanism for achieving the sharing purpose centers around the "intermunicipal account" which is required to be set up on an annual basis and into which constituent municipalities will have an obligation to pay or a right to receive payments therefrom based on application of a statutory formula which converts the tax benefits and tax burdens into dollar payments into or out of the account.

The brief filed by the Attorney General summarizes the operation of the formula as follows:

"All increases in tax revenues, except those required to meet county taxes, between a base year (1970) and an 'adjustment year' attributed to increases in true value of the property in each municipality within the meadowlands district are ascertained, and a gradually increasing percentage of this revenue is payable by each municipality to the intermunicipal account. L. 1972, c. 103, § 4, N. J. S. A. 13:17-67. Each municipality, where eligible, is entitled to receive from the intermunicipal account guarantee payments (§5, N. J. S. A. 13:17-68), school district service payments (§7, N. J. S. A. 13:17-70), and an apportionment payment (§9, N. J. S. A. 13:17-72). Guarantee payments are made where a municipality's meadowland district tax base

1:7-4. We disagree. Proceedings under that statute are limited to an attack only "upon the procedure of making laws — on the machinery of enactment — and not upon the constitutional validity of the law itself." *In re Application of McGlynn*, 58 *N. J. Super.* 1, 13 (App. Div. 1959). Here the Attorney General conceded before the Appellate Division that the Act had not been enacted as a special or local law so that the only remaining issue as to the machinery of enactment (also raised by appellants) was whether the law had been signed by the Governor within 10 days after presentation. Consequently our consideration of the issue whether the Act is valid general legislation is limited to a review of the trial court's determination thereon.

[2] A final Master Plan was adopted by the Commission on November 8, 1972.

has been contracted as a result of public acquisitions. School service payments are made to cover the costs of educating new meadowland district school pupils. The apportionment payment provides for the distribution of any remaining funds in the intermunicipal account on the basis of municipal acreage within the district.

N. J. S. A. 13 :17–74 provides for the computation of the 'meadowlands adjustment payment' to or from each municipality. If a municipality's payment *into* the intermunicipal account *exceeds* the total amount of service payments it is entitled to receive *out* of the intermunicipal account, the difference is entered as a special line item appropriation in the municipal budget for that year and is paid in three annual installments to the intermunicipal account. N. J. S. A. 13 :17–74(c). If the payment *into* the intermunicipal account is *less than* total payment *out* of the account, the difference is shown as 'miscellaneous revenues anticipated' in the municipal budget and is paid by the intermunicipal account in three equal installments. N. J. S. A. 13 :17–74(b). This accounting procedure is adopted for ease of administration of the intermunicipal account. The 'meadowlands adjustment payment', a net figure, should not be confused with its two distinct components—municipal payments into the account, and school service, guarantee and apportionment payments out of the account."

The amended provisions corrected a manifest inequity in the original formula which had used a single "apportionment rate" to calculate municipal payments to the intermunicipal account. This single rate, an average rate based on the combined budgets of all constituent municipalities, had an adverse effect on municipalities with low tax rates. The amendment provides for a separate "apportionment rate" for each municipality which is really its effective or true tax rate, excluding county expenses.

The method of computing the apportionment rate under the amendment is attacked on the ground that a municipality's non-district expenses will affect the amount payable by it to the intermunicipal fund. It is suggested that the only fair solution is a uniform assessment and tax rate for all participating municipalities, limited to the meadowlands district.

This concept, however, would require that the Commission have direct power to make assessments and levy taxes, an alternative which the Legislature rejected, and which some appellants have previously argued would be unconstitutional.

The amendment also eliminated the municipal and county service payments, but limited the amount payable by a municipality to 10% of the amount so calculated in 1973, increasing four percentage points a year to a maximum of 50% of the amount calculated in 1983 and thereafter. This limitation offsets the elimination of the municipal and county service payments by granting each municipality an exemption of 50% from tax sharing to cover the costs of non-school municipal services.

Argument is made that the 50% limitation on the amount payable by a municipality creates the likelihood of inadequate funds in the intermunicipal account with a resultant abatement of school service payments (*N. J. S. A.* 13:17–73), thereby prejudicing municipalities which incur additional school costs as a result of district development.

This argument is purely speculative at the present time. Moreover, a provision for abatement only of service payments to municipalities in the event of inadequate funds in the account is not on its face arbitrary, particularly in light of the stated purpose of the guarantee payment, the only other kind of payment provided for except for surplus distribution.

The provision for a service payment to a municipality for school district services was retained in recognition of the fact that residential development provided for in certain of the municipalities under the Master Plan with attendant increase in school costs, as contrasted with industrial or commercial development provided for in other municipalities, would have an unequal impact on local budgets.

The amendment also revised the method of computing the guarantee payment to a municipality. The purpose of this payment is to protect a municipality against loss of tax ratables in the district. However, it was ascertained that under the original legislation a municipality could become entitled to a guarantee payment even though it lost no meadowland property from its tax rolls, but had merely revalued such ratables. The amendment restricts the guar-

antee payment to a situation where there has been a loss of tax ratables in the district through public acquisition.

It is argued that the amended tax-sharing provisions are arbitrary because payments to the intermunicipal account are unrelated to and not determined by expenditures out of the account. However, these provisions are designed not merely to offset tax burdens resulting from the regional development, but also to have all constituent municipalities share in resultant tax benefits.

This is accomplished by distribution of what remains of the tax benefits, after compensating for whatever tax burdens have been sustained. Use of an acreage basis to distribute this surplus maintains the equitable sharing-of-benefit concept and is not on its face arbitrary.

The formula's selection of 1970 as the base year and the fixing of a two-year spread between the comparison year and the adjustment year is also attacked as arbitrary. Specifically, it is urged that a base year, to have a rational basis, should reflect the date of the adoption of the Master Plan, and that the two-year spread will result in a municipality incurring immediate school costs from District development which will not be calculated in the school service payments for two years.

Selection of the calendar year 1970 as the base year has a rational basis. This was the year in which the Commission adopted and put into effect interim zoning regulations on land use throughout the District. Since the meadowlands adjustment payment (which includes the school district service payment) is required to be certified to each municipality by February 1st of each year, there has to be some financial time lag in the computation. Use of the adjustment year (the same year used in calculating the apportionment rate as well as the increase in aggregate true value of taxable real property in the District), has not been shown to be arbitrary.

The amended tax-sharing provisions present a mechanism for sharing tax benefits and burdens within the District which on its face appears to be rational and fair to constit-

uent municipalities. Experience with the formula will undoubtedly put it in better perspective and establish if, where and how changes are needed to accomplish its purpose. In any event, should a constituent municipality demonstrate that the tax-sharing provisions as actually applied to it work an arbitrary result, it will have the right to secure judicial relief. All we now decide is that the amended provisions have not been shown to be arbitrary on their face.

◼ Some additional matters require brief comment. In the proceedings filed in the Appellate Division under *N. J. S. A.* 1:7–4 it was contended that the legislation was not signed by the Governor within ten days after presentation as required by *N. J. Const.*, Art. V, § I, par. 14(b). The record clearly is to the contrary. The bill, as amended, was presented to the Governor on January 10, 1969 and signed by him three days later. The trial court so held in the proceedings before it. Its finding is clearly correct.

◼ It is also argued that the establishment of the Sports and Exposition Complex excludes from the District an integral part of the meadowlands thereby impairing the basic purpose of the Act and rendering arbitrary a classification predicated upon the original purpose. This contention was not raised before the trial court or in the Appellate Division.

The argument's premise is invalid. The Sports and Exposition Complex established under *N. J. S. A.* 5:10–1 *et seq.* is not at odds with the purpose of the Meadowlands Act. Rather it is a carefully planned development, fully within the objectives of the Act and in furtherance of the aim of overall reclamation and development of the meadowlands.

◼ It is also contended that the Act provides for zoning areas in the District for park, recreational and other public purposes, but makes no provision for compensating the owners thereof.

This argument is also invalid. If privately owned property in the District is zoned for a public use by the Commission, the land will have to be condemned and the owners

compensated. The Attorney General represents that available Federal and State funds, including Green Acres' funds, will be used to acquire property so zoned.

Our decision that there has not been an unconstitutional delegation of the legislative zoning power, and that the Commission, a State agency, may lawfully exercise zoning control over the District, is not to be taken as approval of the actual zoning provisions contained in the Master Plan adopted by the Commission on November 11, 1972. Judicial review of the Plan's zoning details is available should a charge of arbitrariness or illegality be asserted.

Our dissenting colleague finds the amended tax-sharing provisions to be patently arbitrary in their application to constituent municipalities and therefore "unconstitutionally special" legislation. As heretofore noted, our conclusion is that the provisions appear to be rational and fair. We do not say that the present formula is mathematically perfect or that other and better alternatives may not be adopted in the light of experience. The objective sought is within the legislative power and the provisions in question appear reasonably calculated to achieve that objective.

The dissent also finds that the same provisions compel constituent municipalities to raise by local taxation on real property situated therein moneys for the direct and exclusive use of other constituent municipalities, contrary to *N. J. Const.*, Art. VIII, § I, par. 1(a). This issue was discussed at length by the trial court and, as we have noted, we are in agreement with its conclusions that the tax-sharing provisions (the amendment changed only formula details and not the basic concept) imposed a cost of government upon the constituent municipalities in a manner which is "entirely consistent" with the above mentioned constitutional provision.

For the foregoing reasons we affirm the judgment of the trial court and sustain the legality of the amended tax-sharing provisions.

CONFORD, P. J. A. D., Temporarily Assigned, dissenting in part. I am convinced that Article 9, the so-called "Intermunicipal Tax-Sharing" provision of the Hackensack Meadowlands Reclamation and Development Act, as amended by *L.* 1972, *c.* 103, violates the Constitution of 1947 in two respects: (a) it is special and local legislation "relating to taxation * * *" and "regulating the internal affairs of municipalities * * *", contrary to Art. IV, § VII, par. 9(6) and (13) respectively; and (b) it compels municipalities to raise by local taxation on real property situated therein moneys for the direct and exclusive use of other municipalities, contrary to Art. VIII, § I, par. 1(a). I find no constitutional infirmity in any other part of the act; and I would sever Article 9 from the remainder, holding the latter valid, as I regard the act as entirely viable and functionally operable without Article 9 and believe it would have been intended by the Legislature to survive without Article 9 if necessary.

I. *Specialness of Article 9 under*
*Art. IV, § VII, par. 9(6) and (13).*

The constitutional provisions read:

"9. The Legislature shall not pass any private, special or local laws:
*     *     *     *     *     *     *     *
(6) Relating to taxation or exemption therefrom.
*     *     *     *     *     *     *     *
(13) Regulating the internal affairs of municipalities formed for local government and counties, except as otherwise in this Constitution provided."[1]

A provision similar to paragraph 9 was contained in the 1875 Amendment to the Constitution of 1844. Art. IV, Sec. VII, par. 11. It included the substance of subparagraph

---

[1] The exception in subparagraph (13) is not here applicable as it is conceded there was no petition for a private, special or local law as permitted by Art. IV, § VII, par. 10.

(13), but not that of subparagraph (6). The 1875 Amendment was adopted to curb the pervasive practice of the Legislature previously in enacting a whole profusion of special acts for specific purposes or objects or having relation to particular individuals or localities, whether one or more, without regard to the appropriateness of such legislation for general application. *Van Riper v. Parsons,* 40 *N. J. L.* 1, 8–9 (Sup. Ct. 1878). Special legislation is the result of improper classification of the objects of the legislation. Such impropriety, in the constitutional sense, arises if the law does not "affect equally all of a group who, bearing in mind the purposes of the legislation, are distinguished by characteristics sufficiently marked and important to make them a class by themselves." *Harvey v. Essex County Board of Freeholders,* 30 *N. J.* 381, 389 (1959). In *Alfred Vail Mut. Assoc. v. Bor. of New Shrewsbury,* 58 *N. J.* 40, 50 (1971), the Court held fatally special an act whose classification of school districts for certain purposes was found to have had "no rational relationship to the purpose of the statute".

Legislation can be unconstitutionally special even where it affects groups of municipalities, as here, as distinguished from a single municipality, if its classification of them has no rational relationship to its object. *Jersey City v. Zink,* 133 *N. J. L.* 437, 448–449 (E. & A. 1945), *cert. den.* 326 *U. S.* 797, 66 S. Ct. 493, 90 L. Ed. 485 (1946).

The effect of violation of Art. IV, § VII, par. 9 is not merely that there is a consequential violation also of Art. IV, § VII, par. 8, which requires public notice of the intention to apply therefor as to all private, special or local laws. Special, etc. laws coming within any of the specific subparagraphs set forth in Art. IV, § VII, par. 9 are *absolutely* void, whether or not Art. IV, § VII, par. 8 is complied with. *Jersey City v. Zink, supra. Cf. Alfred Vail Mut. Assoc. v. Bor. of New Shrewsbury, supra.* Special, etc. laws not coming within the specific subparagraphs in

Art. IV, § VII, par. 9 are valid, if public notice is properly given.[2]

Thus, if, as I conclude is the case, Article 9 of the instant act is a special or local law regulating the internal affairs of municipalities, or relating to taxation, or both, it is absolutely void without more.

I proceed, accordingly, to an examination of whether the effects of Article 9 rationally comport with its purported purpose. As to what that purpose is, there is no dispute. Everyone involved in the case agrees that the purpose is an equitable apportionment as between the fourteen municipalities having territory in the Meadowlands District of the financial benefits and detriments flowing from the "development of the meadowland district as a whole". (See Section 59 of the act (*N. J. S. A.* 13 :17–60) as amended by *L.* 1972, *c.* 103). More specifically, the State describes the benefits and detriments in terms of "tax-sharing", and this accords with the title of Article 9 — "Intermunicipal Tax-Sharing". Thus the intent is that municipalities getting more taxes out of the statutory operation of the meadowland district than they would in its absence contribute therefrom to a common fund or "pool", and that municipalities losing taxes therefrom be reimbursed out of the pool.

As I believe will be plain from a description of the operative provisions of Article 9,[3] the so-called benefited municipalities who, under the act, are surcharged therefor, are surcharged arbitrarily without any necessary relation in fact to tax benefits resulting from development of the district

---

[2]Provided, however, they do not offend the "mandatory" clause at the end of Art. IV, § VII, par. 9 which requires that the Legislature pass general laws for all cases which in the legislative judgment may be provided for by general laws. See the *Alfred Vail* case, *supra*, (53 *N. J.* at 52–53).

[3]The discussion hereafter of the operative provisions of Article 9 is based entirely upon the amendments adopted in *L.* 1972, *c.* 103, which the trial court never had occasion to pass on, and which this Court fails to analyze in any detail in the majority opinion.

under the act. The so-called deprived municipalities who under the act take from the pool do so arbitrarily, without any relation in fact to tax losses they supposedly suffer from the development of the district. As the majority opinion points out, this Court "expressed concern over the fairness of the tax-sharing provisions" of the original act when argument was first had in this case in February 1972. As a result, those provisions were amended by *L.* 1972, *c.* 103. It is clear to me, however, that the amendments in net effect have, if anything, compounded the original unfairnesses. True, a court's view of the "unfairness" of legislation will not necessarily equate with a conclusion of unconstitutional specialness. But in my judgment the amended provisions are not merely unfair; they render the portion of the act under consideration unconstitutional; they are invalid on their face since their arbitrariness in the light of the purported purpose of the provisions is patent against facts either of record or of common knowledge of which the court may and should take judicial notice.

The tax-sharing provisions of Article 9 may be summarized as follows:

The Commission is required to set up annually an "intermunicipal account". Constituent municipalities either contribute into the account or fund or they receive moneys from it, or both, depending upon the application of specified statutory criteria. All funds in the account are to be paid out each year; the Commission retains nothing. Neither the State nor the Commission ever contributes to the fund. A municipality's payment obligation is subtracted from the sum of all payments due to it from the fund to determine its "meadowlands adjustment payment". *N. J. S. A.* 13:17–74. If what is due to a municipality exceeds what is due from it, the excess is paid to it and that item goes into its budget as "miscellaneous revenues anticipated". If what is due from a municipality exceeds what is due to it, it must appropriate the excess in its budget as a special line item, raise it by local taxation and pay it

to the intermunicipal account. *N. J. S. A.* 13:17–74(b) and (c).

Payments to and from a municipality are due in an "adjustment year", commencing with 1973. Calculations of payments involve comparisons between a "base year", which is always 1970 and a "comparison year", which is the second calendar year preceding the adjustment year.

*A — Basis for obligation of municipality to pay into fund.*

Each municipality must pay into the intermunicipal account an amount of money calculated by multiplying its "apportionment rate" (see below) for the comparison year by the amount of dollars by which the "aggregate true value"[4] assessments of locally taxable real property in the municipality and in the district *in that year* exceed the aggregate true value assessments of that property *in the base year,* 1970. *N. J. S. A.* 13:17–67 (subject to the qualification stated in the next sentence hereof). In the first adjustment year, 1973, this debit is set at 10% of the product of such multiplication, increasing by 4% in each ensuing adjustment year for 10 years, when it will be 50%, that percentage continuing forever thereafter. *N. J. S. A.* 13:17–67 (b).

The "apportionment rate", for purposes of the foregoing paragraph, is determined by dividing the total property taxes levied by the municipality in the comparison year for local, school, veteran and senior citizen purposes (essentially all local purpose taxes except county purposes) by the aggregate

---

[4]The act provides that the "aggregate true value" of real estate within the district boundaries of a municipality is to be fixed by application of the "average assessment ratio" promulgated by the Director of the Division of Taxation for state school purposes. Such ratios, however, are fixed for whole municipalities, not for any segment thereof. See *Tp. of Willingboro v. Burlington Cty. Bd. Tax.,* 62 *N. J.* 203, 211–212 (1973). The consequent effect of the foregoing consideration on the arbitrariness of the tax-sharing provisions will be discussed *infra.*

true value of all real property in the municipality as equalized for state school purposes by the Director of the Division of Taxation. *N. J. S. A.* 13:17–61(g).

It is thus apparent that each constituent municipality will have its own apportionment rate struck each year; and further that the theory of the annual surcharge is that any municipality the equalized true value of whose assessed realty in the District increases over that of the base year has benefited from being in the Meadowland District by an assumed accretion in its favor of that number of dollars which would be realized by multiplying the rate at which it taxes property for local (except county) purposes by the stated increase in equalized assessed value of realty in the District. Therefore, so the assumption goes, a charge against the municipality for a portion of that "benefit" (which will reach 50% thereof in ten years) is rationally related to the purpose of Article 9.

### B—*Bases for payments or credits from the fund in favor of municipality.*

The act provides for three types of payments or credits to municipalities out of the fund.

(1) "Guarantee Payment". The formula as to this is complex but in essence it provides that if the equalized (by application of the Director's ratios — see *supra*) aggregate true values of assessed realty of a municipality in the District in a comparison year goes below such equalized assessed values for 1970, and if that decrease is attributable to the intervening exemption of real property in the District from taxation by reason of its acquisition by *any* governmental body for *any* public purpose, then such municipality qualifies for a payment or credit out of the fund in the amount produced by multiplying such decrease in equalized assessed true values by the municipality's "apportionment rate" (see *supra*). *N. J. S. A.* 13:17–68.

It will be at once noted that this "guarantee payment" is activated by acquisitions or condemnations of property by *any* public agency (whether or not the Meadowlands Commission) and for *any* public purpose whether or not related to meadowland development.

(2) "Service Payment" for school district purposes. It is provided that for any increase in the number of enrolled pupils resident within the District boundaries of a municipality on September 30 of a comparison year over the number on September 30, 1970 the municipality is to receive from the fund a payment or credit equal to the product of the multiplication of the increase in the number of resident pupils by the per-pupil cost of education in the comparison year. *N. J. S. A.* 13:17–70.

If guarantee payments exhaust the balance in the fund, school service payments are abated.

(3) "Apportionment Payment". If there is a surplus in the fund in any adjustment year after all due guarantee and school service payments have been made, that surplus is apportioned among *all* the constituent municipalities in the same ratio as the number of acres of land within the District of each municipality bears to the total number of acres in the entire District. *N. J. S. A.* 13:17–72(a).

The fact case for specialness of Article 9 is best appraised in the light of the leading decision on the point, *Jersey City v. Zink, supra* (133 *N. J. L.* 437) — a case strikingly comparable to that before us here. *Zink* involved the constitutionality of chapters 4, 5, 6 and 34 of the Laws of 1945, attacked as special legislation regulating the internal affairs of municipalities in violation of the prohibition of such legislation contained in the 1875 amendment of the 1844 Constitution cited above. The constitutional issue was activated after the court first held that accrued interest moneys on delinquent Class II railroad property taxes for the years 1932–1940, which interest had been paid by the taxpayers to the State Comptroller and was being held by him pending distribution thereof to the municipalities to which the taxes

were due by statute, belonged to such municipalities as a matter of law. The 1945 statutes under attack in the case purported to redistribute the millions of dollars of tax-interest moneys involved in substantially the following manner. The amounts due the municipalities were retroactively reduced from the 12% statutory railroad interest tax rate to $3\frac{1}{2}\%$; $4,000,000 of the remainder of the money was appropriated for distribution to all the municipalities of the State as a tax-saving measure on the basis of the proportion of resident pupils of such municipalities in the public schools; after certain other minor dispositions the remainder of the money was provided to be retained by the State.

The complaining municipalities[5] in *Zink* contended that in effect the 1945 laws had created two classes of municipalities — those wherein the delinquent Class II railroad properties were located, which were required to surrender revenues under the statutes — and all the municipalities of the State as a whole, which were made the beneficiaries of the redistribution of $4,000,000 of the money, purportedly for tax relief purposes. It was contended that there was no rational basis to assess the Class II tax-recipient municipalities on the fortuitous basis of the amount of railroad tax interest then due them as a means of defraying the cost of a legislative plan to afford general tax relief to all the municipalities of the State. The Court of Errors and Appeals agreed that the legislation was impermissibly arbitrary, and therefore special, in its classification of the municipalities, and it held that the legislation did concern the regulation of the internal affairs of municipalities, within the absolute prohibition of special legislation in that category under Art. IV, § VII, par. 11 of the then Constitution. 133 *N. J. L.* at 448–449.

---

[5]The briefs of the municipalities on file in *Zink* spell out the contention as stated in the text much more pointedly than its reflection in the opinion of the Court of Errors and Appeals.

The Attorney General has not challenged *Zink* as continuing authority under the 1947 Constitution for requiring that legislation classifying municipalities for purposes of imposing upon them financial (particularly tax, or tax-related) burdens and benefits be free from arbitrariness or irrationality in terms of the relationship of the effects of such legislation to its purported purposes or objects. The import of *Zink* is even more emphatic under the 1947 Constitution in view of the addition by that document to the categories of absolutely prohibited special legislation as set forth in the 1875 amendment, that "relating to taxation or exemption therefrom". Art IV, § VII, par. 9(6).

In the light of the constitutional principles of *Zink* and the other authorities cited above, I return to a consideration of the question of arbitrariness of the tax-sharing scheme of Article 9 of the Meadowlands Act. The proposition is practically self-demonstrative.[6]

Dealing first with the provision for surcharging constituent municipalities on the basis of any increase of the equalized true value of ratables in the District since 1970, it is at once to be noted that Article 9 does not require the increase to be causally related to any activity of the Commission. The Legislature apparently indulged a presumption, as does the Attorney General in defending the provision, that any increase in the equalized true value of any realty in the District after 1970 would be imputable to the fact that zoning of the District is, under the act, exclusively a matter for the Commission.[7] That presumption is the most transparent illusion conceivable. Real property in northeastern

---

[6]Not all the plaintiffs make all the assertions of specialness developed here. However, substantially all these observations have been espoused in some form by one or more plaintiffs, either by brief or on oral argument.

[7]The District Zoning Regulations of the Commission did not even become operative until November 8, 1972. Sub-division regulations were promulgated in November 1969.

New Jersey (indeed, in the State as a whole) of almost every kind has been in a sharp upward trend of value for the past generation and, as of 1970, bid fair to continue on that path for the indefinite future. The hindsight of 1973 confirms the said 1970 prospect, and all indications are for the continued upward realty valuation spiral for the foreseeable future. There is every reason to assume that increases generally in the true value of district realty in the meadowland municipalities after 1970 will be attributable, at least in substantial measure, to the inflationary trend adverted to. This is so notwithstanding it is readily conceivable that constructive zoning changes in some parts of the District *might* play a part in accelerating or creating rises in value in some locations.

It is thus plain that there is no rational basis whatever for the statutory assumption that increases in equalized true value of district realty after 1970 in any particular municipality will be attributable *per se* to the fact that the Commission has exercised under the act the zoning powers previously vested in the municipalities themselves. In the first place not all the zoning regulations adopted by the Commission have effected changes in land-use permitted under preexisting zoning. But even as to areas where land-use regulations have been altered by the Commission, Article 9 requires no showing of any causal correlation between any zoning regulation and any increases in equalized values which are made the basis for a surcharge against the municipality. The surcharge is automatic. A restrictive zoning change can as well depress as increase the true value of property affected by it. One cannot of course assume that all zoning changes effected by the Commission have increased or will increase rather than decrease the value of realty affected thereby.

The arbitrary nature of the surcharge is further accentuated by the circumstance that increases in assessed value of realty can result from improvement of vacant land as well as from appreciation of parcels of land, improved or unimproved. The record shows, for example, that portions

of the northwestern segment of the District have for some time been heavily industrialized and that further industrial improvement of land in the area is a fair prospect for the future. Thus even if, as in such a case, the District zoning does not alter the prior zoning as to a particular area and the owners improve the property in any way, the resulting appreciation in assessed value becomes a part of the basis for surcharging the municipality, as Article 9 operates on the basis of mere rise in aggregate true value of ratables *per se*. How can the portion of a surcharge so generated be thought remotely related to Meadowland Commission activity of any kind, zoning or otherwise?

Finally, in respect of measuring increases in equalized value of assessed ratables, we noted above that Article 9 assumes that the Taxation Division Director's ratios for equalization of aggregate municipality-wide realty valuations are automatically usable for an arbitrarily selected segment of the municipality — as here the meadowland district portion of the municipality. This is an utterly unwarranted factual assumption, see *Tp. of Willingboro v. Burlington Cty. Bd. Tax., supra, passim,* and it further compounds the arbitrariness of the surcharge provisions of Article 9 in the other respects discussed herein.

Passing even all the foregoing, one confronts the irrationality of the Article 9 assumption that a municipality having District realty ratables increasing in aggregate true value over that of 1970 is necessarily enriched thereby to the extent of the dollars produced by multiplication of its effective local-purpose tax rate ("apportionment rate") by the amount of such ratable increase. It is elementary that increased ratables do not of themselves increase the pecuniary yield of taxation. They merely broaden the base for determination of the rate at which the municipality will tax for its budget requirements, which are not a function of its ratable base, or *vice versa*. Moreover, as is commonly known, increased ratables are not necessarily beneficial pecuniarily to either a municipality or its preexisting realty

taxpayers. That depends on whether the new ratables require more municipal services than the share of the tax levy they absorb. But Article 9 willy-nilly surcharges the municipality for all ratable increases on an automatic basis.

Before passing this subject it needs to be noted that it has not at any time been argued on behalf of the validity of Article 9 that the surcharge has a relation to any activity of the Meadowland Commission other than its zoning power. The surcharged increase in tax ratables, for example, need not, under the act, be shown to result from any physical or other development activity of the Commission.

Turning now to a consideration of the issue of rationality of the provisions of Article 9 for credits or payments out of the Fund in favor of municipalities, one continues to find a picture of rife illusoriness.

First, as indicated above, a municipality gets a credit from the intermunicipal fund for every year in which its aggregate equalized ratables in the District are less than in 1970 if attributable to acquisitions by *any* governmental body or agency for public purposes of *any* nature, whether or not related to Meadowland Commission activity. For example, if the federal government condemned or purchased a District plot of land for an atomic energy plant or a post office and the resulting tax exemption of the property caused a reduction of aggregate assessed valuations in the District area of a town below those of 1970 that municipality would in every year forever thereafter have to be compensated out of the fund in a sum equal to the product of the multiplication of the said reduction of ratables by the apportionment rate of the municipality. What relationship a municipality's being in the Meadowland District bears to the legislative purpose of giving it such an annual subsidy (at the expense of all the other municipalities in the District) defies any response. At least none to the point has been afforded by the Attorney General. This basis for benefits-credits out of the fund in favor of municipalities under Article 9 is patently arbitrary as unrelated rationally to any purported

purpose of Article 9. It might possibly have been different if compensation were granted only for land acquisitions by the Commission for meadowland development purposes.

The second statutory basis for credits in favor of a municipality against the Fund is the school service payment which operates automatically to give a municipality an annual dollar subsidy for each year in which District resident school enrollment of a municipality exceeds the enrollment thereof as of 1970, and in a sum represented by multiplying such increase by the per-pupil cost of education in the municipality for the comparison year. The theoretical justification for this subsidy is that any increase of school children resident in meadowland areas is presumptively attributable to residential zoning by the Commission. The factual falsity of that premise is obvious. Many areas of meadowland zoned residential by the Commission were zoned residential previously, or, in any event, were the sites of residential property continuing as such after the jurisdiction of the Commission began. Residential growth in such areas after 1970 totally independent of Commission zoning may thus well produce increased numbers of District school children in particular municipalities to the same extent as though the Meadowlands Act had never been passed; yet under Article 9 such increases automatically redound financially to the annual benefit of the municipality in question at the expense of all the other municipalities in the District *via* the independently arbitrary surcharge formula examined above. There is no basis in reason to favor the recipient municipality in this manner in terms of any purported purpose of Article 9.

The third basis for benefits from the fund under Article 9 is probably the most arbitrary of any of the formulae of that article for either surcharges upon or benefits to municipalities. This is the so-called "apportionment payment" proviso which, to reduce it to simple terms, provides that if there is anything left in the fund in any adjustment year after payments out for "guarantee" or "school service"

claims the balance is distributable among all the constituent municipalities on the basis of the proportionate acreage of total meadowland located in the particular municipality. In other words, even if Town A has contributed 5 times as much as Town B to the intermunicipal account in a given year, but Town B has five times as much meadowland district acreage as Town A, Town B will take from any fund balance at the end of the year 5 times as much money as Town A. There has not been even a pretence of rational justification advanced for this provision in terms of relation to any conceivable legislative purpose of Article 9.[8] As things stand, the combined effect of this provision and that for surcharging is that all the constituent municipalities whose assessed ratables of District land increase in value after 1970 (for whatever reason) pay money into the Fund annually which is then in whole or in part disbursed to all the municipalities (whether or not they pay in) on the basis of the proportion of District acreage in the municipality.

I submit that the foregoing considerations conclusively establish the arbitrariness of all the tax-sharing provisions and therefore their specialness, in contravention of the constitutional provisions cited above. Even if only one or more of them were arbitrary, *e. g.,* the surcharge provision, that alone would necessarily taint and stamp the operation of the plan as a whole as arbitrary and invalid. I respectfully dissent from the observation in the majority opinion, which does not examine the tax-sharing plan in any detail, that it is "on its face" "rational and fair to constituent municipalities". I believe the foregoing detailed analysis demonstrates it to be just the opposite. It seems to me the statute subjects the 14 constituent municipalities to a species of mutual tax-diversion under cloak of the euphemism of tax-sharing.

---

[8] One is driven to wonder why it was not simply provided that any unexpendable balance in the fund at the end of any given year should be refunded to the contributing municipalities in the same proportions as their contributions.

The State contributes nothing to the municipalities in compensation for their purported disadvantages, although the project as a whole is hailed as one redounding to the benefit of the State at large, and they are made to go through an essentially random process of feeding off each other's revenues to no purpose realistically related to any discernible object of the statute.

I conceive no useful purpose to be served by the suggestion of the majority that "should a constituent municipality demonstrate that the tax-sharing provisions as actually applied to it work an arbitrary result, it will have the right to secure judicial relief". It is inevitable that the invitation will result in a plethora of litigation on grounds such as those described above which can warrant judicial relief only if the Court finds the provisions invalid, not merely unfair. Sound policy calls for making the determination of invalidity now, as amply warranted from the face of Article 9, so that such litigation may be averted at the outset and the Legislature be advised accordingly, freeing it to adopt such valid substitutionary provisions as it may desire, if any.

## II. *Invalidity of the Tax-Sharing Provisions under the Tax Clause of the 1947 Constitution.*

Appellant Town of Secaucus contends, and I agree, that Art. VIII, § I, par. 1(a) of the 1947 Constitution prohibits what Article 9 of this statute does — *i. e.,* forces particular municipalities to raise money by taxation of local real property for payment over to and for the exclusive use of other municipalities. Article 9 does this in the manner described above when any municipality which in any later year has equalized aggregate assessed valuations of District ratables exceeding those of 1970 is compelled to raise by general taxation as part of its annual budgeted appropriation a sum equal to such excess times the "apportionment rate", and such sum is then required to be paid out *pro tanto* to or to

the credit of the other constituent municipalities to satisfy their statutory credits as described above.

It seems clear to me that this practice is literally and intentionally proscribed by the constitutional provision cited above, which reads:

"Property shall be assessed for taxation under general laws and by uniform rules. All real property assessed and taxed locally or by the State for allotment and payment to taxing districts shall be assessed according to the same standard of value, [except as otherwise permitted herein,] and such real property shall be taxed at the general tax rate of the taxing district in which the property is situated, *for the use of such taxing district.*" (Emphasis added)[9]

The tax clause of the 1844 Constitution, as amended in 1875, Art. IV, § VII, par. 12, read:

"Property shall be assessed for taxes under general laws, and by uniform rules, according to its true value."

A comparison of the 1875 and 1947 tax clauses demonstrates two major changes in the latter; first, the elimination of "true value" as a constitutionally requisite standard of valuation for assessment, and second, a specific treatment of real property taxation. The second mandate is to the effect that *if* the Legislature chooses to provide *either* for the direct local assessment of real property *or* for its assessment by the State for allotment and payment to taxing districts, *all* realty assessed in either such manner shall be assessed according to the *same* standard of value, and at the local general tax rate, *and* that the proceeds of any such real property taxation shall be for the use of the taxing district where the property is situate.

The 1947 tax clause had a specific historical genesis — one which has recently been adverted to by this Court. See

---

[9]The bracketed portion of the foregoing was added by a 1963 amendment concerning assessment of farm lands; the remainder of the section is as adopted in 1947.

*Robinson v. Cahill,* 62 *N. J.* 473 at 504–05 (1973). Briefly, Governor Driscoll, who spearheaded the movement for revision of the Constitution, wanted the elimination of true value from the tax clause. V *1947 Constitutional Convention Proceedings,* pp. 771–72. The Hudson County municipalities, wherein the bulk of valuable Class II railroad property was situated, wanted the nullification of the Railroad Tax Law of 1941 (*L.* 1941, *c.* 291) which provided for the taxation by the State of such property for local municipal use at the fixed rate of 3%, whereas previously such property had been taxed at the general tax rate of the municipality where situate; rates which, as of 1941, averaged over 5%, and higher by 1947. See the argument propounded at the Convention on behalf of the municipalities through counsel for the State League of Municipalities, V *1947 Constitutional Convention Proceedings, op. cit. supra* at 566 *et seq.* The 1941 law had been sustained as constitutional in *Jersey City v. State Board of Tax Appeals,* 133 *N. J. L.* 202 (Sup. Ct. 1945), modified *sub nom. Jersey City v. Kelly,* 134 *N. J. L.* 239 (E. & A. 1946).

The Hudson County municipalities were willing to take their chances that no later legislature would change the existing allocation of Class II railroad taxes from their traditional disposition for the use of the municipalities wherein situate but they felt the need of constitutional assurance that, even if so allocated, the taxes would not be reduced by a legislative variation in either the standard of valuation or the tax rate applicable thereto as contrasted with the tax treatment of real property generally. Accepting these demands as the price of elimination of the true value language from the tax clause and of insuring the success of the constitutional proposals as a whole at the forthcoming referendum, representatives of Governor Driscoll met privately at the home of the president of the Convention with members of the taxation and finance committee of the convention and delegates representing the interests of the Hud-

son County municipalities on the evening of August 25, 1947, when the finally adopted tax language was agreed upon. See *Connors, The Process of Constitutional Revision in New Jersey*: 1940–1947 (1970) (National Municipal League, State Constitutional Convention Studies, No. 4), p. 181;[10] I 1947 *Constitutional Convention Proceedings, op. cit. supra* at 773.

The language draft thus negotiated was formally approved by the delegates in open convention the next day, August 26, 1947. I *1947 Constitutional Convention Proceedings, op. cit. supra* at 785.

The crux of the instant dispute centers on the language at the end of the clause, calling for the taxation of "such real property * * * for the use of such taxing district". Appellant Secaucus argues that this clause ("for the use of" etc.) applies to both of the categories of real property dealt with in the paragraph, *i. e.,* such as is taxed locally and such as is taxed by the State for allotment and payment to taxing districts (*e. g.,* Class II railroad property).[11] The brief of the Attorney General is in apparent agreement on that limited issue but the trial court was not. That tribunal thought the "for the use of" language appertained only to the designation of property taxed by the State for local allotment and payment and not to the designation of property "assessed and taxed locally". 112 *N. J. Super.* 89, 119, n. 8. I disagree with the trial court and agree with Secaucus. Both the syntactical structure and the underlying sense of the provision point to the intent that the direction for local use of the tax proceeds is applicable both to locally assessed

---

[10]The final draft of language is said to have been suggested by counsel for the State League of Municipalities, which had espoused the cause of the Hudson County municipalities. *Ibid.*

[11]The contention is that the Legislature cannot divert such realty tax proceeds for the benefit of different taxing districts.

and state assessed realty otherwise covered by the tax paragraph as a whole.[12]

Certainly the "for the use of" language cannot be regarded as in any sense surplusage. It seems obvious that at least from the standpoint of the municipalities the purpose was to lock the door against any device whereby they might indirectly be deprived of the fruit of their constitutional campaign by a later legislative diversion of the realty tax proceeds after they had labored to compel the burden of taxation on locally situated real property to be equal.

The foregoing is not to say that the tax clause proscribes the proceeds of local real estate taxation being made available for programs or purposes having scope beyond the particular municipality so long as the taxing municipality has a substantial beneficial interest in such a program or purpose. Taxation for county government or for regional school purposes affords stock examples. Another is the former state school tax levied locally on property statewide for support of education. So, too, as to local taxation for support of a state-maintained policemen and firemen's pension fund which redounds to the benefit of pensions of local policemen and firemen. *Cf. Passaic v. Consolidated Police, etc. Pension Fund Commission,* 18 *N. J.* 137 (1955). Innumerable similar examples could be cited of valid local taxation for purposes transcending strictly local needs provided the localities share in the benefit of the expenditure.

But undoubtedly the "for the use of" provision of Art. VIII, § I, par. 1(a) would be offended if, for example, the

---

[12]The meaning of the clause accepted in the text is supported by the explanatory remarks on the floor of the convention of Delegate Charles K. Barton, who was one of the conferees mentioned above who preliminarily came to an accord on the language finally adopted (*Connors, op. cit. supra* at 181): "* * * there must be a standard of value uniformly kept and a standard of rate uniformly kept in the assessment and collection of taxes on real estate, and, then, *that the moneys are to be returned or collected by the municipality in which this real estate is located* * * *." I *1947 Constitutional Convention Proceedings, op. cit. supra* at 777 (emphasis added).

Legislature were to enact a law calling, without more, for Newark to raise by local taxation and to pay over to Jersey City a sum equal to the latter's annual requirements for street maintenance (apart from the incidence of violation thereby also of the constitutional prohibition of special and local legislation). The 1947 Constitution was adopted only two years after the decision in *Jersey City v. Zink, supra.* As appellant Secaucus correctly points out, that case rested not only on the rationale of the specialness of the classifications of the municipalities benefited and burdened by the statutes there of concern, but also on the fundamental principle of "representative government" that "where there is a delegation of the taxing power, or an essential element thereof, to a local taxing district, the tax raised thereunder can only be used for the *sole purpose* [italics by court] of enabling such districts to exercise the powers of government conferred on them within the territorial limits of the district." 133 *N. J. L.* at 445–446. This philosophy is thoroughly consonant with the product of the 1947 constitution-makers in the area under discussion, and there is nothing about the adoption of the 1947 tax clause to indicate any intent for a departure from what the Court of Errors and Appeals deemed fundamental organic law in 1945. The surcharges levied by Article 9 of the instant act on the constituent municipalities will therefore survive the mandate of Art. VIII, § I, par. 1(a) only if the contributing municipalities can be regarded as having a substantial beneficial interest in the purposes for which the surcharged funds are to be expended.

Review of the analysis of the operation of Article 9 as set out in Part I of this opinion can yield only a negative answer to the criterion posed. Passing all considerations therein discussed as to the arbitrariness of the basis for the surcharge itself, certainly the governmental needs or purposes of Secaucus or North Bergen would not, for example, be served by the acquisition by the federal government of land for a post office or atomic energy plant in Moonachie or Rutherford. Yet Article 9 would in effect require Secaucus

and North Bergen to raise by taxation on local real estate moneys to be paid over or credited to Moonachie or Rutherford to assuage its loss of District ratables because of that kind of acquisition. As already noted, this applies to *any* acquisition by *any* public agency for *any* public purpose no matter how irrelevant to the operations of the Meadowland Commission. The same inter-municipal subsidization occurs if Moonachie's or Rutherford's resident school population within the meadowland district increases over what it was in 1970. Further, as noted above, as to part of what Secaucus or North Bergen are surcharged for, it is possible and probable, under Article 9, that such moneys will be distributed, without any rhyme or reason, to Moonachie and Rutherford and all the other constituent municipalities on the basis of their respective proportions of meadowland acreage.

In fine, Article 9 compels each of the constituent municipalities to raise by local taxation money for purposes or uses which afford them no benefit whatever, and it therefore plainly violates the tax clause of the Constitution.

## III

I have, finally, to face the question whether, if Article 9 is void, the whole Meadowlands Act must fall. Such a result would be a most unfortunate one and should be avoided if reasonably possible. The Meadowlands Act is the culmination of over a generation of study and planning looking toward the comprehensive development in the broad public interest of a whole geographical area in the heart of the metropolitan region which has heretofore largely lain fallow.

Concededly, I must respect the legislative declaration that the tax-sharing provisions of Artice 9 are a "vital component of any comprehensive plan for the development of the meadowland district * * *." *N. J. S. A.* 13:17–60(a). On the other hand, the act contains a standard severability clause, *N. J. S. A.* 13:17–85, which is also entitled to con-

structional weight. The judicial task is to determine whether the Legislature would have intended the whole act to fall if it knew the "tax-sharing" provisions were invalid. I have no difficulty in concluding in the negative on that question. The public benefit of the act lies exclusively in the operative provisions for the physical planning and development of the meadowland area as a whole. The statutory mechanisms for those purposes are in nowise dependent upon the tax-sharing scheme. That scheme can be excised without an iota of effect upon the operative plan of the act. See *N. J. Chapt. Am. I. P. v. N. J. State Bd. of Prof. Planners,* 48 *N. J.* 581, 593–594 (1967), appeal dismissed and *cert.* den. 389 *U. S.* 8, 88 S. Ct. 70, 19 L. Ed. 2d 8 (1967). There would be little difficulty in the Legislature providing by later supplement in a constitutional manner for any desirable objective inhering in Article 9 (*e. g.,* a legislative appropriation for tax losses resulting from acquisitions by public agencies).

I thus conclude that Article 9 is void but that the remainder of the act is severable and valid.

Justice MOUNTAIN and Judge LEWIS join in this partly dissenting opinion.

*For affirmance*—Chief Justice WEINTRAUB, Justices JACOBS and HALL, and Judge SULLIVAN—4.

*Dissenting in part*—Justice MOUNTAIN, and Judges CONFORD and LEWIS—3.